UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

STEPHEN ALLEN,                                    COMPLAINT

                          Plaintiff,

                                                  .Case No: 2006 CIV _____

        - against -

                                                  Jury Trial Demanded

J.P. MORGAN CHASE & COMPANY; J.P.
MORGAN CHASE BANK, NA; GEORGE GATCH,
Individually and in his official capacity as an Officer
of J.P. Morgan Chase & Company; EVE GUERNSEY,
Individually and in her official capacity as an Officer
of J.P. Morgan Chase & Company; DEANNA BASLER,
Individually and as a management member of J.P.
Morgan Chase & Company; and LYNN AVITABILE,
Individually and in her official capacity as a member
of the Human Resources Department of J.P. Morgan
Chase & Company,

                          Defendants.

--------------------------------------------------------------X

        COMES NOW Stephen Allen ("Allen"), by his attorneys, The Law Office of Neal Brickman,

P.C., 317 Third Avenue, 21st Floor, New York, New York 10017, and as and for his Complaint

against defendants, hereby avers and states as follows:

### Statement Pursuant to Local Civil Rule 1.9

        1.      Plaintiff is an individual citizen of the United States of America and, as such, has no

interests or subsidiaries that need to be disclosed.

### Nature of the Action

        2.      This action arises under Title VII of the Civil Rights Act of 1964, as amended; the

Americans' with Disabilities Act of 1990 ("ADA"). 42 U.S.C. § 12101 et seq., as amended; the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, as amended; New York

Executive Law §296 et seq. and New York City Administrative Code §8-107 et seq., as well as

-1-

various additional state and common law causes of action based on Defendants' improper and illegal demotion and retaliation against Mr. Allen. Mr. Allen also alleges causes of action for breach of contract and fraud relating to the Defendants' failure to pay him promised compensation during the first two years of his employment.

3.   This action seeks compensatory and punitive damages, as well as costs and attorneys' fees, based on the discriminatory and retaliatory actions undertaken by Defendants in improperly demoting and harassing Mr. Allen based upon his age and disability and in retaliation for his complaint about the that discrimination.

## Jurisdiction

4.   Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of the United States; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367. This action is timely filed within ninety (90) days of the issuance of a valid Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), a copy of which is annexed hereto as Exhibit "A".

## Venue

5.   This action is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), because the defendant resides in this judicial district, and (b)(2), because a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.

## Parties

6.   Allen ("Plaintiff" or "plaintiff") is a 53 year old male citizen of the United States and a resident of Westfield, New Jersey who within the relevant period was forced to go on disability leave to undergo surgery and treatment for an internal disorder.

-2-

7.     Upon information and belief, defendant J. P. Morgan Chase & Company ("JPMC&C") is, and was at all times relevant hereto, a foreign corporation duly authorized to transact business under and pursuant to the laws of the State of New York, maintaining an office at 1 Chase Plaza, New York, New York 10013.

8.     Upon information and belief, defendant J.P. Morgan Chase Bank, NA ("JPMCB") is, and was at all times relevant hereto, a foreign corporation duly authorized to transact business under and pursuant to the laws of the State of New York, maintaining an office at 1 Chase Plaza, New York, New York 10013.

9.     Upon information and belief, at all times relevant hereto, defendant George Gatch ("Gatch"), an individual citizen of the United States, was an officer of JPMC&C who served as the Head of Funds Management and had supervisory authority over Allen. Gatch qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because he participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of his ability to effect the terms and conditions of Allen's employment.

10.    Upon information and belief, at all times relevant hereto, defendant Eve Guernsey ("Guernsey"), an individual citizen of the United States, was an officer of JPMC&C who served as Gatch's supervisor and had supervisory authority over Allen. Guernsey qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of her ability to effect the terms and conditions of Allen's employment.

-3-

11.     Upon information and belief, at all times relevant hereto, defendant DeAnne Basler ("Basler"), an individual citizen of the United States, was an employee of JPMC&C who assumed the position of Head of Business Development when Mr. Allen was improperly demoted for the second time and who had direct supervisory authority over Allen. Basler qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of her ability to effect the terms and conditions of Allen's employment.

12.     Upon information and belief, at all times relevant hereto, defendant Lynn Avitabile ("Avitabile"), an individual citizen of the United States, served in the Human Resources Department of J.P. Morgan Chase & Co. Avitabile qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because she participated directly in the discriminatory and/or retaliatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of her ability to effect the terms and conditions of Allen's employment.

## Relevant Facts

13.     In or about August, 2001, Mr. Allen entered into serious discussions concerning employment with JPMC&C. At the time, Mr. Allen was working for Lord Abbett earning in excess of $1,000,000 in total compensation per annum for each of the preceding three years.

14.     At the same time that JPMC&C was soliciting Mr. Allen for employment, he was also fielding offers from Blackrock and Ashland; the latter of which was offering a significant equity element as part of its offered remuneration package to Mr. Allen.

- 4 -

15.     In his preliminary discussions with James Detmer ("Detmer") and Bob Deutsch ("Deutsch") of JPMC&C, prior to his hire, Mr. Allen made it clear that he would only come on board if the potential compensation would be at least comparable to what he had been making at Lord Abbett.

16.     Detmer and Deutsch, on behalf of JPMC&C, specifically and repeatedly asserted that Mr. Allen would be guaranteed a *minimum* total compensation of Seven Hundred and Fifty Thousand Dollars ($750,000.00) for calendar year 2002 and that it was expected that he could, in fact, earn in excess of that amount in 2002.

17.     On or about September 17, 2001, Mr. Allen accepted Defendants' offer of employment based on the guaranteed minimum as identified by Detmer and Deutsch.

18.     On or about September 19, 2001, Mr. Allen received an offer letter from JPMC&C dated September 18, 2001 that neglected to include the guaranteed minimum component on which Mr. Allen had specifically relied in accepting the employment offer from JPMC&C, rejecting the offer from Ashland and declining to pursue other employment opportunities readily available to him at that time.

19.     Mr. Allen immediately contacted Detmer and Deutsch who separately assured him that the guarantee was still in place and that they would take care of the issue, but that he should go ahead and counter-sign the offer letter so that his employment could continue to be processed.

20.     Reasonably relying on the representations of Detmer and Deutsch, Mr. Allen signed and returned the offer letter on September 20, 2001.

21.     On September 21, 2001, Mr. Allen received a follow-up e-mail from JPMC&C which asserted that the $200,000.00 bonus for the fourth quarter of 2001 was the amount equivalent

-5-

to a pro-rated amount of his minimum expected bonus of 2002 -- a calculation which would suggest that Mr. Allen would have been reasonable in expecting his bonus for 2002 to equal $800,000.00, in addition to his salary of $175,000.00, equaling a total compensation of almost $1,000,000.00.

22.     At the time Mr. Allen started work at JPMC&C on October 1, 2001, JPMC&C had little or no retail business, and what little business it did have was in net redemption.

23.     Mr. Allen was hired based on his reputation in the field, his specific experience and his numerous and invaluable contacts to assess and design a short and long term strategy whereby JPMC&C could gain placement for its products with key brokers and grow its retail investment asset management business. With success, this would lead to an increase in its mutual fund assets under management at other broker dealers and, ultimately, leverage a burgeoning separate account business into the mutual fund and advisory products of the main broker-dealers.

24.     Mr. Allen immediately began to develop and implement a plan focusing on developing a bona fide separate account business for JPMC&C's investment management products at the four main wire houses headquartered in New York, Citigroup/Smith Barney, Merrill Lynch, Morgan Stanley and UBS; all while husbanding the existing relationships with Schwab, Lockwood and others. Mr. Allen's strategy was adopted without reservation by Defendants.

25.     His intention, which he successfully executed with unparalleled success, was then to leverage the separate accounts business into mutual fund and advisory products business within the major wire houses.

26.     At the time of his hire, Defendants had little or no business or assets under management with Merrill Lynch or Citigroup/Smith Barney and no relationship at all with Morgan Stanley. Moreover, the only separately managed account of it offered at any of these four wire

-6-

houses was offered in UBS's Access program: that mandate comprised a JP Morgan Fleming ("JPMF") small cap growth portfolio with less than $40 million that had lost investors significant percentages of their investments over each of the prior three years and was on the verge of termination. The mandate was, in fact, terminated shortly after Mr. Allen began working for Defendants.

27.     By the end of 2002, as a direct result of the efforts of Mr. Allen, the assets under management -- solely with respect to separate accounts -- at JPMF and Citigroup/Smith Barney grew to approximately $431,895,578.00[1] and $82,847,090.00, respectively. Tellingly, these figures do not even include the gains in mutual fund investments and increased relationships during 2002.

28.     Specifically, based on his individual efforts and contacts, Mr. Allen was able to have JPMF asset management products listed with Citigroup/Smith Barney -- gaining entry into Citigroup/Smith Barney fiduciary services and then, ultimately, into mutual funds directly and was able to secure placement at Merrill Lynch's discretionary mutual fund program, "MFA", and was able to obtain a sub-advisory mandate into Merrill Lynch's variable annuity, "MLIG".

29.     Despite this amazing growth and clearly overwhelming success in implementing his approved and adopted growth strategy, Defendants -- inexplicably and in a blatant demonstration of hubris infused cheapness -- refused to pay Mr. Allen even his guaranteed minimum total compensation and ultimately paid him $100,000.00 less than the *$750,000.00 minimum* they had guaranteed him would be his *minimum* base compensation for 2002.

30.     In addition, at the close of 2002, in contravention of JPMC&C's own written policies

---

Throughout the Complaint, assets listed with JPMF constitute total assets, inclusive of retail business at the other wire houses listed.

and procedures -- and perhaps to avoid attempting to justify their actionable refusal to even meet Mr. Allen's minimum guaranteed base compensation, to say nothing of his warranted compensation -- Mr. Allen received no written or oral performance review.

31.     In 2003, Mr. Allen increased his already lucrative contribution to Defendants. In fact, in the fourth quarter of 2003, assets -- again, solely in separate accounts -- under management were calculated as follows: a) JPMF - approximately $1,493,407,426.00; b) Citigroup/Smith Barney - approximately $209,715,676.00; c) Merrill Lynch - approximately $85,317,382.00; and d) Morgan Stanley - approximately $351,830,955.

32.     These already phenomenal numbers, however, do not tell the full story. In addition, in 2003 Mr. Allen enabled and orchestrated JPMC&C's entry into Morgan Stanley's highly coveted "Access" program for separately managed accounts; entry into Morgan Stanley's exclusive Funds Solutions program; increased participation in Merrill Lynch's sub-advisor insurance products; continued growth in Merrill Lynch's MFA; entry into Merrill Lynch's Consults program; and successful placement of 12 mutual funds, an unprecedented number, in UBS's mutual fund program, "PACE", an opportunity to which Defendants had not even been previously exposed; all of which resulted in substantial current and future revenue for JPMC&C -- revenue which Defendants did not share, in any meaningful fashion, with Mr. Allen despite reasonable expectation that such revenue would be reflected in his year-end bonus.

33.     While Mr. Allen's 2003 performance was lauded[2], he not only did not receive proper

The acclamation was not reserved for solely internal praise as Morgan Stanley recognized JP Morgan with the New Manager of the Year award for 2003. They would go on to receive the Sales Director Award from Morgan Stanley in 2004. The accolades and achievements/results garnered by Mr. Allen and JPMC&C were the direct results of his individual efforts, as well as those of his team-members as directed and motivated by Mr. Allen -

-8-

remuneration for the same basis on reasonable expectation or industry standards, but also was again not afforded a formal performance evaluation.

34.     Specifically, despite the existence of a formal institutionalized performance evaluation process, for 2003 Mr. Allen received no performance review and nothing, at all, in writing regarding his performance or any concerns regarding his management style. It is notable that his compensation for 2003 was unchanged from 2002, effectively perpetrating the earlier breach and in direct contravention to the assessment of Mr. Allen's supervisor, George Gatch, that no other individual had contributed more to the vastly expanding sales and distribution of J.P. Morgan asset management products at other broker dealers than Mr. Allen.

35.     Nevertheless, at the end of 2003, not coincidentally after the lines of business at Merrill Lynch, Morgan Stanley, UBS and Citigroup/Smith Barney had been opened by Mr. Allen for Defendants, Mr. Allen was advised orally by Gatch that reporting roles were being changed within his department.

36.     Specifically, Deutsch, who was located in Delaware, was removed as Mr. Allen's direct manager and Deutsch's involvement in the broker dealer business was eliminated completely. Mr. Allen was told that he would report to Detmer, his former peer, and that he would no longer be co-head of broker dealer sales.

37.     Despite the diminution of title, Mr. Allen's day-to-day responsibilities were not changed, nor were any of his day-to-day responsibilities.

38.     As referenced above, amazingly at the same meeting at which his title was being stripped from him and Gatch asserted that Mr. Allen was the individual most responsible for the

---

- further evidence of his strong managerial record as based on concrete results.

unprecedented growth in the sale and distribution J.P.Morgan asset management products, Gatch promised that, despite the change in title, Mr. Allen would earn *at least* his original *guaranteed minimum* compensation of $750,000.00 for 2003 as reflected in his bonus to be paid out in February 2004, if he, the department, and the firm performed well.

38.     As the numbers bore out, the relevant performance was not simply good, but extraordinary. Throughout 2004, Mr. Allen and the strategy that he devised and implemented continued to produce unparalleled success. At the beginning of 2004, he successfully lead the effort to secure a mutual fund distribution agreement ( a selling agreement) with Morgan Stanley and also overcame past bad results at UBS with the aforementioned JPMF small cap growth portfolio by securing placement for JPMF's International ADR portfolio.

40.     In 2004 JP Morgan implemented its merger with BancOne. Numerous press reports discussed Respondent's desire to reap billions in annual savings from personnel cuts. In order to eliminate redundancy and retain -- as between JP Morgan and BancOne employees -- the more desirable and productive employees, the two banks performed "stack rankings" in the summer of 2004.

41.     In a nod towards his irrefutable off-the-charts success to date, in that process, Mr. Allen was retained in his then current position as head of National Accounts, while his counterpart at BancOne, Phil Anglim, was moved to a new position as Midwest Division Sales Manager. Moreover, Mr. Allen was asked by Detmer and JPMC&C to develop a post merger distribution strategy for the new merged entity, including channelization strategy, firm focus, and divisional management structure.

42.     This retention was not only warranted but nearly mandated by the continued amazing

-10-

growth of assets, the entry into a sub-advisory agreement with UBS to manage $300,000,000.00 in assets; participation in Merrill Lynch's CDP program as a sub-advisor to both Merrill Lynch Investment Managers ("MLIM") and CDC IXIS -- with total current assets of approximately $500,000,000.00 under management; and continued exponential growth throughout the year at all major brokerage houses.

43.    In May and October of 2004, Mr. Detmer reviewed Mr. Allen and found the results produced by Mr. Allen and the National Accounts Group to be consistently good. In both meetings Mr. Allen was given positive feedback regarding his management style and interaction with colleagues. Mr. Detmer was completely satisfied with Mr. Allen's performance and developmental progress and offered no negative feedback of any kind in either meeting.

44.    Shortly after the October review and in accordance with the formal institutionalized performance process, on or about October 25, 2004, Mr. Allen met with Mr. Detmer to provide him a copy of the performance appraisal which -- as per Defendants' stated procedure -- he was going to enter into the automated system and the 8 page 2004 performance summary document (referenced in the appraisal) that detailed the excellent results Mr. Allen and his team had attained relative to the firm's 2004 objectives. Simply, they had *again* crushed all benchmarks. Mr. Detmer concurred with said performance summary and had no corrections or edits.

45.    Specifically, as of September 30, 2004, the annualized rates of growth ("ARG") of assets under management in separate accounts and mutual funds at the major brokerage houses were virtually unheard of and certainly nothing short of dramatic: (a) at Merrill Lynch separate accounts reflected an ARG of 479% and mutual funds reflected a ARG of 89%; (b) Morgan Stanley separate accounts reflected an ARG of 412% and mutual funds reflected an ARG of 989%; (c)

-11-

Citigroup/Smith Barney separate accounts reflected an ARG of 28% and mutual funds reflected an ARG of 36%; and (d) UBS separate accounts reflected an ARG of 263% and mutual funds reflected an ARG of 119%.

46.     These numbers only increased as of the fourth quarter of 2004 when Defendants' assets under management -- again solely in terms of separate accounts -- were approximately $4,056,912,352.00 at JPMF; approximately $338,917,172.00 at Citigroup/Smith Barney; approximately $489,837,375.00 at Merrill Lynch; and approximately $1,918,696,104.00 at Morgan Stanley.

47.     Not surprisingly, Mr. Allen's 360 assessment of managers, peers and direct reports in 2004, included many accolades, including, but not limited to:

      a.     "Steve and his team have done a tremendous job at putting us on platforms at our partner firms. *In the past two years, they have accomplished what other firms might only dream of doing.*";

      b.     "Steve is one of the hardest working members of National Accounts. He is consistently accessible and responsible, and he is diligent about helping others get the answer that they need for their clients.";

      c.     "1. Overall industry and product knowledge is second to none. 2. Great instincts when reading situations with clients. 3. Great problem solver, especially with helping all team member understand his point of view and reasoning or solving any problem.";

      d.     "Great industry knowledge and contacts. Great work ethic. Excellent motivator and leader.";

      e.     Industry knowledge is Steve's key strength. His ideas and strategies are often

-12-

the best within FFI sales. I believe Steve is truly looking out for the best intention of the firm's success...Client communication is another key attribute. Each and every day, the client is Steve's first priority.;

        f.     Steve demonstrates a tremendous amount of dedication to this business, our clients, and his team. He is focused on delivering the best of the best in terms not only of products but also value added services to help our clients succeed...Regarding his team, Steve shows a commitment to helping us reach the next steps in our career paths."; and

        g.     one colleague, when asked to list three areas in which Allen needed to improve, wrote "[n]o negatives at this time."

The end result was an overwhelmingly positive review for 2004.

    48.    In a brazen -- albeit misguided and illegal -- attempt to cut-off Mr. Allen after they had gained footholds and tremendous growth in new markets in the amount of *billions of dollars*, Defendants through Detmer brought Mr. Allen in and advised him on January 5, 2005 that he had a choice: he could continue his then job as head of National Accounts under a "zero tolerance" policy or he could resign his position: a choice forwarded at the behest of Mr. Gatch and Ms. Guernsey.

    49.    Amazingly, Defendants did not even tell Allen what he had done in 2004 that would no longer be tolerated. At best, and as absurdly propounded by the Defendants in the underlying EEOC action, Defendants appear to have attempted to resurrect some interpersonal issues between Mr. Allen and one of his colleagues from 2003 in an offensive attempt to justify their abusive and callous shunting of Mr. Allen in early 2005.

    50.    Among the bases for determining that the after-the-fact conjured up attempted justification for Mr. Allen's discriminatory treatment in January, 2005, is the fact that the individual

-13-

with whom he allegedly had a problem in 2003 worked directly with him throughout 2004 with no complaint or even inference of difficulty. Aside from the fact that Mr. Allen received -- as reflected above -- universal accolades for his treatment of his team, it must be noted that the purported individual, Nicole St. Pierre, and Mr. Allen not only worked closely throughout 2004, but were extremely successful in that pairing as exemplified by the successful culmination of the CDP opportunity at Merrill Lynch.

51.    The absurdity of Defendants' acts on, and preceding, January 5, 2005, is only highlighted by the fact that in the course of that same meeting Detmer confirmed verbally in front of Noreen Marmando, an HR specialist, what he had previously represented in the two reviews during 2004, namely that Mr. Allen was deserving of an entirely positive review for his performance during 2004. Detmer further confirmed, at that meeting, that the full scope and nature of Mr. Allen's role as head of national accounts had remained constant from 2003 through 2005.

52.    The January 5, 2005 presentation of such a stark hobbesian choice certainly constituted an act of discrimination against Mr. Allen based on his age in a specific attempt by Defendants to rid themselves of the need to compensate Mr. Allen for all of the revenue he had generated for them.

53.    Shortly thereafter, on January 10, 2005, Allen met with Mr. Gatch and Noreen Mormando, an HR specialist, and made a specific complaint regarding the "zero-tolerance" threat and attributed Defendants' bad treatment of him to a discriminatory animus based on his age. In fact, he asserted that he intended to file an action based on age discrimination; breach of contract and fraud.

54.    Upon information and belief, Defendants never so much as investigated Allen's

-14-

complaint nor ever responded to those charges.

55.     On or about January 27, 2005, Jamie Dimon, the newly named president and CEO apparent of the company, held a Town Hall meeting and strongly conveyed the message that there needed to be greater flexibility in dealing with management styles that effected good results for the business and that *results, and only results, should be the standard by which performance is driven, assessed and compensated.* Mr. Dimon also specifically told the audience that if they experienced any difficulties in reference to his statements that any such employees should complain to their supervisors and to Human Resources which would serve as the employees ombudsmen.

56.     Such a message only added salt to the abusive heightened scrutiny or quit threat instituted by Defendants against Mr. Allen only a few weeks prior. As such, and having already submitted a charge of discrimination to his supervisor, as well as JPMC&C's human resources, Mr. Allen wrote to Guernsey on January 28, 2005 to request a meeting and highlight the absurdity, and pre-textual nature, of the "choice" proffered him in light of JPMC&C's stated position on management and results as forwarded in the Town Hall -- and its applicability to Mr. Allen, in any event, as evidenced by the verbal reviews by Detmer and peer comments throughout 2004.

57.     The meeting with Guernsey was scheduled for February 8, 2005.

58.     Unfortunately, while away with his family, in part indubitably due to the heightened stress that he was suffering as a result of the discriminatory harassment he was suffering at the hands of Defendants, Mr. Allen's previously undiagnosed diverticulosis worsened resulting in severe abdominal pain requiring hospitalization and the diagnosis of the condition diverticulitis.

59.     Mr. Allen's assistant contacted Guernsey to inform her of his diagnosis; the fact that he was in the hospital; and the immediate need to postpone their already scheduled meeting.

-15-

60.     Ultimately, Mr. Allen met with Guernsey on or about February 15, 2005. In that meeting, Mr. Allen iterated numerous concerns including the disparity, without reason, between Defendants' stated policies and their treatment of him as reflected by the discriminatory "choice" presented to him in January, 2005 and the implementation of the same. In that meeting with Ms. Guernsey, she explicitly acknowledged that she was aware that Allen had complained previously about age discrimination and acknowledged his disability, but specifically advised him that she did not wish to discuss these issues at all. The complaint of discrimination would continue to go unacknowledged by Defendants.

61.     At that point, Mr. Allen had still not been afforded a formal written review for 2004 despite numerous requests that the repeated positive verbal reviews from Detmer be memorialized in writing and entered into the performance review system in accordance with Company rules and regulations.

62.     On or about February 23, 2005, Mr. Allen returned to his doctor and learned that he required surgery to deal with his condition and that he would have to take material leave time.

63.     This circumstance was directly communicated to Defendants and, specifically, Guernsey who was supposed to meet with Mr. Allen on February 28, 2005 to follow-up on their prior meeting.

64.     After repeated rescheduling of the meeting, Guernsey called Mr. Allen, apologized for the delays and specifically told him that he had to meet with her, as well as Gatch and Detmer -- to resolve outstanding issues and establish his business goals and objectives as required to begin the 2005 review process -- before he went on disability leave.

65.     Cognizant of his impending disability leave -- and the legal requirements regarding

-16-

the preservation of his position when he returned -- Guernsey finally met with Mr. Allen on March 3, 2005.

66.      Ms. Guernsey encouraged him to participate in a formal review process -- now over three months late as per Company rules and regulations and her prior directives on timeliness -- to formalize feedback ostensibly to allow 2005 objective and goal setting to occur. Mr. Allen quickly realized -- and communicated his beliefs to Guernsey that the new review "process" as a 13th hour re-opening of the prior reviews -- aside from being completely unsupported by Defendants' own policies -- could only serve as an opportunity for Defendants to change the previously positive reviews confirmed in front of HR solely in an attempt to create a bogus legitimate non-discriminatory basis for their behavior.

67.      Guernsey said that Mr. Allen was wrong and that he need to "trust" her.

68.      Mr. Allen was then told to meet with Detmer and Gatch later that day to have such a review and discuss goals and objectives for 2005.

69.      In that meeting, Mr. Allen was told that he was being demoted and that he would now have to toil under the title of Senior Client Relationship Manager for the major houses with whom he had built relationships for Defendants.

70.      Defendants, in a blatantly pre-textual manner, for the first time expressed that they had purported problems with Mr. Allen's performance -- although, apparently, not with the incredible business model he had constructed or the consequent revenue streams generated therefrom and despite the fact that when specifically questioned, they had no objection to Mr. Allen's self-appraisal and performance summary previously provided to Detmer and timely entered into the system in October, 2004.

-17-

71.    Defendants, apparently -- albeit understandably due to the fallacious nature thereof -- insecure in their contrived verbal charges, attempted to construct, after the fact, some basis for their "policy" decision. Specifically, they created a written review document which varied from the prior verbal reviews and the written notes by Detmer given to Mr. Allen on January 4, 2005 in front of Ms. Normando. These notes had not been given to Mr. Allen in October 2004, but were given to Mr. Allen by Detmer on January 4, 2005 when he demanded that the entirely positive review communicated to him by Detmer in 2004 and reiterated to him in front of Ms. Normando in January, 2005 -- including the assertion that Mr. Allen had done everything that he had been asked to do and did it extremely well -- be put in writing and entered into the system.[3]

72.    In a blatant demonstration of Defendants' continued abuse of process and discrimination, and in a specific attempt to bolster their completely fabricated justification for such abuses and in contravention of their own internal policies, the Defendants actually changed language in the "new" review in an attempt to minimize the positive categorizations of Mr. Allen's performance. Specifically, Defendants modified the unqualified assessment that "...the results in his area of responsibility continue to be good" and inserted the baseless qualified assessment that, "...the results *with external clients* in his area of responsibility continue to be good." Not surprisingly, Defendants entered these changes at the same time as Mr. Allen's demotion -- in such a fashion so as to minimize, if not eradicate, his opportunity to comment, a right provided by Defendants' own

---

In their opposition papers submitted to the EEOC, Defendants further impugn their integrity by asserting that a mysterious, cabal-esque "Talent Committee" had assessed Mr. Allen negatively and such opinion formed the basis for the discriminatory treatment, heightened scrutiny and demotion. Amazingly, Defendants attempted to use such a transparent ploy despite the unequivocal fact that such a review, or any negative critiques, was never even mentioned to Mr. Allen; not at his many January 2005 meetings with Gatch, Detmer, Guernsey, or Human Resources, nor at any time during 2005 prior to his filing of his EEOC Charge.

-18-

internal policies.

73.     In that afternoon meeting, Defendants did give Mr. Allen an alternative to accepting the demotion, termination.

74.     Simply, Defendants had chosen to avoid the strictures of the Family Medical Leave Act and simply furthered their pre-existing discrimination with an additional act of discrimination -- upon information and belief at the behest of Gatch and Guernsey -- by demoting Mr. Allen, removing him from his position as head of National Accounts and assigning him to a role as a "Senior Client Relationship Manager"[1] just before his required medical leave.

75.     The next day Mr. Allen was provided a written description of his demoted position, Senior Client Relationship Manager, and informed that his total compensation would likely fall anywhere from $550,000.00 to $250,000.00 and that he could expect $400,000.00 with a high level of performance -- *or barely one-half the compensation that he had been promised as a minimum* in his prior position.

76.     Later on March 4, 2005, Mr. Allen met again with Ms. Guernsey who advised him to take the new position or seek assistance of counsel if he felt he was not being treated fairly.

77.     Allen accepted under protest this demoted position -- asserting that this was simply another unwarranted act of discrimination against him by Defendants -- and was, in fact, demoted

---

The absolute pretext of any purported basis that Defendants now might attempt to push upon this Court must be viewed in the context of their clearly pre-textual prior reliance upon the phantom Talent Assessment which shockingly is purported to assert that absent improvement - of what no one is certain - Mr. Allen would be let go after the second quarter of 2005. Ironically, 2005 reflected only continued successes of Mr. Allen and no negative reviews, but he was, nonetheless, demoted, stripped of title and position, humiliated in front of peers and colleagues, had his reputation and earning capacity tarnished in the industry, and had his salary cut a minimum of $250,000.00.

and -- ultimately replaced by a younger individual.

78.     Tellingly, these adverse employment actions all occurred directly after Allen complained about age discrimination, after his disability became apparent and in an environment in which older workers were routinely displaced by younger employees[5] and in which Allen was repeatedly told -- by management -- that the organization needed new blood, and that he needed to think about the National Accounts role in an entirely new way.

79.     As a direct result of these discriminatory actions, Mr. Allen filed a Charge of Discrimination with the Equal Employment Opportunity Commission on March 16, 2005.

80.     In a blatant showing of disregard for the civil rights laws of this Country and State, shortly after returning from his disability leave, Mr. Allen was again demoted in that he was given the role of a junior relationship manager assisting individuals significantly younger than he: specifically, Anne Santoro was named as the Relationship Manager for the Morgan Stanley account, and Kevin Shanley was named as the Relationship Manager for the UBS account -- relationships that would not have even existed but for his contacts.

81.     Specifically, his initial demotion to Senior Relationship Manager had been stripped directly after returning from disability leave and in further discrimination based on age and in retaliation for his complaint concerning the same. This demotion was effected by Basler with the support of the other individual defendants.

82.     On or about June 21, 2005, when Basler informed Mr. Allen of his demotion in the

_____

Corporate Defendants have a history of firing, or otherwise ridding themselves, of their older employees. James Detmer, Dave Veta, Aaron Chazen, Kathleen Prichard, Curt Pollitt and Jackie McCarthy, among others, are all examples of older veteran employees in Mr. Allen's department who were displaced from their positions in favor of younger employees within an eighteenth month period following the Bank One merger.

-20-

presence of Anne Santoro, Mr. Allen asked for notice of the demotion and of his new responsibilities in writing -- a reasonable request in that directly before going on leave he was provided a job description of his prior -- albeit demoted -- position of Senior Relationship Manager.

83.     Basler, in response to this reasonable request, became very upset, so much so that Ms. Santoro became uncomfortable and asked to leave; subsequently, Basler accused Mr. Allen of being obstreperous both at that meeting and, without foundation or personal knowledge, on prior occasions; further evidencing Defendants' conspiratorial bent to discriminate and retaliate against Mr. Allen.

84.     These new assignments were communicated internally to Defendants' sales team who interfaced with external clients and publicly to clients and the industry, effectively discrediting Mr. Allen and permanently hampering his ability to seek management roles and earning a living to which he had become accustomed and deserved on the basis of his invaluable contributions to Defendants.

85.     Amazingly, these demotions and continued abuses tied to the increasingly hostile working environment, were perpetrated even as Mr. Allen had "effectively led the efforts of the National Accounts (NA) team" and its clients through the manifestly complicated merger of the JPMC/Bank One fund families, according to Defendants the biggest fund merger in history and the most important event for JPMF's bottom line for 2005.

86.     Defendants' clear intent to force out Mr. Allen was further demonstrated by the almost farcical machinations concerning his mid-term review for 2005 initially presented on or about July 28, 2005.

87.     Initially, the review created, upon information and belief, by Basler initially failed to even address the elements of the fund merger which Mr. Allen had successfully overseen.

-21-

88.    Possibly even more indicative of the Defendants' improper retaliatory intent, the initial review -- created by Basler and condoned by Defendants, including Avitabile -- contained outright lies concerning Mr. Allen's relationship with Anne Santoro; improper characterizations of a meeting between Basler, Santoro and Mr. Allen; and generally inaccurate characterizations of Mr. Allen's willingness to adapt to his improper and discriminatory demotions.

89.    When Mr. Allen received this review, informed Detmer of the inaccuracies therein and requested that Detmer verify the tales of Basler with Ms. Santoro, Detmer declined but did agree to have, at Mr. Allen's request, a human resources representative present for a discussion of the review later that afternoon.

90.    Tellingly, the afternoon meeting between Detmer, Basler, Avitabile and Mr. Allen, opened with Avitabile acknowledging the pending EEOC complaint and asserting that she did not want to discuss the same, but to focus solely on the review itself.

91.    Very quickly, Detmer acknowledged that the significant contributions of Mr. Allen were improperly portrayed by the review.

92.    The individual defendants also quickly acknowledged that their attempts to portray Mr. Allen as a non-team player in the review were without proper basis.

93.    The discussion then turned to the contention by Basler that Mr. Allen had been unprofessional in the prior meeting with Ms. Santorio in which Basler demoted Mr. Allen. Basler admitted that Mr. Allen had simply asked her for a written description of his new title and responsibilities -- hardly unprofessional given the Defendants' (1) prior presentation of such documents when Mr. Allen was previously demoted without legal justification; (2) propensity for saying one thing and doing another as had been exemplified to Mr. Allen repeatedly over the past

-22-

few years with greater and greater regularity -- most recently with Basler's assigning him a position at odds with the Senior Client Relationship position assigned to him by Detmer in writing in March, 2005.

94.    However, Basler's true invidiousness was highlighted in the continued discussion in which it was revealed -- in direct contravention of Basler's assertion in the review that Mr. Allen was having trouble working with Ms. Santoro -- that only a few days prior to her contentions therein, she had met personally with Ms. Santoro who had informed Basler how effectively Mr. Allen and she had been working together and what a good relationship they had.

95.    When faced with the absolute falsity of the review and the unqualified lies set forth therein, Avitabile, who had in that same meeting acknowledged awareness of Mr. Allen's prior charges of discrimination and retaliation, rather than trying to protect Mr. Allen's rights, chose to attempt to minimize future liability on the part of Defendants.

96.    In an attempt to cover-up the clearly retaliatory review, Avitabile reached across the table, grabbed Mr. Allen's copy of the review and tore it up, before collecting the copies of the same in front of Detmer and Basler, while asserting, in sum and substance, "we screwed up."

97.    When Mr. Allen later attempted to obtain a copy of this review -- his copy of which Avitabile had forcibly taken from him and destroyed -- from Avitabile and expressed his concerns with her actions, she ignored his initial request and asserted, *inter alia*, she would "not respond to any more emails designed to discredit my actions and/or the processes of the firm." Essentially, Defendants had once again determined to close ranks and attempt to conceal their ongoing and escalating retaliatory discrimination against Mr. Allen.

98.    Despite this clearly abusive and improper behavior from Defendants, Mr. Allen

-23-

continued to diligently work on their behalf eliciting favorable reviews including that "Steve has acted professionally given that his assignment has been different than he was initially led to believe it would be...," as set forth in his revised mid-2005 review.

99.     Mr. Allen continues to suffer the ongoing effects of Defendants' discriminatory actions while being relegated to a hostile ageist environment from which he has no prospects of alternative employment as Defendants protracted and continued stream of demotions have served to destroy his credibility in the industry, exactly as they had intended. Among other abuses, Mr. Allen now finds himself in a diminished role reporting to Jed Laskowitz, an individual who is clearly his junior in age, seniority and experience and who not only reported to Allen in 2002, but has been previously removed from prior management positions because of his inability to deal with colleagues and peers.

100.    Meanwhile the avenues of businesses opened as a direct result of Mr. Allen's strategy and efforts continue to generate ridiculous sums of money for Defendants.

101.    A conservative calculation for 2005 demonstrates that these avenues of business generated approximately Forty Million Dollars ($40,000,000.00) in revenue to JPMC&C from Morgan Stanley, UBS, Merrill Lynch and Citigroup/Smith Barney alone.

102.    Mr. Allen's reward for creating these revenue streams -- that will continue to generate such revenues in the future -- was continued discriminatory demotions and compensation cuts in an an increasingly hostile working environment.

103.    The EEOC granted Mr. Allen a Right to Sue letter dated July 17, 2006. (A copy of the Right to Sue letter is annexed hereto as Exhibit "A").

## AS AND FOR A FIRST CAUSE OF ACTION

-24-

(Violations of the Americans with Disabilities Act as Against the Corporate Defendants)

104.    Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "103" with the same force and effect as if fully set forth herein at length.

105.    The ADA prohibits discrimination on the basis of a disability.

106.    It is unquestioned that Mr. Allen requested and took short term disability leave in the Spring of 2005.

107.    It is unquestioned that within two weeks of his requesting such leave and making his medical condition known to Defendants that he was demoted without good cause or justification.

108.    It is unquestioned that other employees, not suffering from such a disability were not similarly demoted, harassed, or otherwise discriminated against.

109.    As a direct result of this discriminatory behavior, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00) in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Violations of the ADEA Against the Corporate Defendants))

110.    Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "109" with the same force and effect as if fully set forth herein at length.

111.    Plaintiff was over fifty (50) years of age at the time that Defendants created false performance reviews, doctored reviews, harassed Plaintiff, harmed his reputation in the community and his filed, curtailed his earning capacity on a short and long term basis and demoted him.

-25-

112.   Not only was Plaintiff replaced by a series of younger employees, but also was relegated to reporting to materially younger individuals with far less seniority and experience in the field, but he was also subject to an institutionalized acceptance perpetration of ageism.

113.   There was no legitimate non-discriminatory basis for Plaintiff's demotion and threatened termination.

114.   Similarly, younger employees were not demoted despite having tremendous success for the Defendants, nor were they subjected to contrived performance reviews, non-compliance with the Corporate Defendants' own policies concerning performance reviews or otherwise demeaned for no legitimate basis whatsoever.

115.   Similarly situated younger employees were also not denied their promised compensation and were, in fact, paid what had been agreed to be due and owing to them for their work.

116.   As a direct result of this age discrimination in the form of disparate treatment, hostile work environment and overall improper and pervasive ageism with Defendants, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00) in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Improper Retaliation in Contravention of the ADEA as Against the Corporate Defendants)

117.   Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "116" with the same force and effect as if fully set forth herein at length.

-26-

118.   Directly after complaining of perceived discrimination on the basis of his age and in direct retaliation therefor, Plaintiff was demoted, discredited in the industry and otherwise discriminated against by Defendants.

119.   No such acts had any legitimate or non-discriminatory basis.

120.   As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Five Million Dollars ($5,000,000.00) in compensatory damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### (Age and Disability Discrimination in contravention of New York Executive Law §296 and New York City Administrative Code §8-107 Against All Defendants)

121.   Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "120" with the same force and effect as if fully set forth herein at length.

122.   Both the New York Executive Law and the New York City Administrative Code prohibit workplace discrimination, adverse employment decisions and disparate treatment on the basis of age and disability.

123.   Plaintiff suffered a disability within the meaning of §296 of the Executive Law and §§8-107 and 8-502 of the New York Administrative Code in that his condition and subsequent treatment impaired a normal bodily function.

124.   Each of the individual defendants are personally liable for the bad acts perpetrated against Plaintiff as they each qualify as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because they, and each of them, participated directly in the discriminatory and/or retaliatory conduct at issue

in this case and as an "employer" under § 296 of the Executive Law by virtue of their, and each of their, ability to effect the terms and conditions of Allen's employment.

125.    Based on Mr. Allen's age and disability, Defendants failed to pay him the compensation agreed upon, contrived negative reviews of his performance, improperly placed fraudulent documents in his personnel file, denied him credit and the proper remuneration for his efforts on their behalf, cut his earning capacity on a short-term and long-term basis, damages his reputation within the workplace and the industry and demoted him.

126.    As a direct result of this illegal and improper discrimination, in the form of disparate treatment, hostile work environment and overall improper and pervasive ageism with Defendants, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than Five Million Dollars ($5,000,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Retaliation in contravention of New York Executive Law §296 and New York City Administrative Code §8-107 Against All Defendants)

127.    Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "126" with the same force and effect as if fully set forth herein at length.

128.    Both the New York Executive Law and the New York City Administrative Code prohibit workplace discrimination, adverse employment decisions and disparate treatment in retaliation for the submission of a complaint alleging discrimination on the basis of age and disability.

-28-

129.    Directly after making complaint of discrimination and in retaliation therefor, Defendants effected their threats by actually demoting Plaintiff, by doctoring his employment file and by submitting false reviews -- all in direct contravention of local and state law, as well as the Corporate Defendants own written policies.

130.    There was no legitimate basis for these adverse employment actions.

131.    As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in no event less than Five Million Dollars ($5,000,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Fraud in the Inducement as Against the Corporate Defendants and Gatch)

132.    Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "131" with the same force and effect as if fully set forth herein at length.

133.    At the time of his hire, Plaintiff was promised total compensation for year 2002 of no less than $750,000.00.

134.    Plaintiff relied on this representation in foregoing alternative employment and in accepting employment with Defendants.

135.    At the time this representation was made and condoned by Gatch it was known to be false and certainly it was never anticipated that an amount equal to or in excess of $750,000.00 would ever be paid to Mr. Allen.

136.    In fact, these false representations were made for the sole purpose of inducing

-29-

Plaintiff to forego other work options so that Defendants could effectively suck the knowledge and contacts from Mr. Allen while knowing that as soon as they had done so they would toss him aside.

137.   Mr. Allen duly and reasonably relied on these representations in foregoing other employment.

138.   Subsequently, in late 2003, Mr. Gatch again told Plaintiff, and Plaintiff reconfirmed, that he could earn $750,000.00 after changing his reporting responsibilities -- but not his day-to-day activities or responsibilities -- from co-head of his group if he, the group and the bank performed well.

139.   Mr. Gatch made this statement -- knowing that Mr. Allen would never be paid $750,000.00 -- for the sole purpose of inducing Mr. Allen to remain employed by JPMC&C and to not seek alternative employment.

140.   Mr. Allen duly and reasonably relied on this statement and through his direct efforts brought the fund amounts under management at JP Morgan, Citigroup/Smith Barney, Merrill Lynch, UBS and Morgan Stanley into the billions of dollars.

141.   Mr. Allen, not surprisingly, was never paid the promised amounts.

142.   As a direct result of this fraud in the inducement, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00) in compensatory damages; costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Breach of Contract As Against The Corporate Defendants)

-30-

143.   Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "142" with the same force and effect as if fully set forth herein at length.

144.   Plaintiff was to be paid $750,000.00 for his work for Defendants in 2002.

145.   Defendants paid Plaintiff only $650,000.00 despite his generating of millions of dollars of revenue for them, as well as opening previously non-existent lines of business and avenues of revenue.

146.   Plaintiff performed all of his duties and responsibilities under the agreement between Plaintiff and JPMC&C.

147.   Nevertheless, Defendants breached the agreement.

148.   As a direct result of this breach of contract, Plaintiff was damaged in an amount determined at trial, but in no event less than Two Hundred Thousand Dollars ($200,000.00) in compensatory damages; costs and disbursements of this action; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Quantum Meruit/Unjust Enrichment As Against The Corporate Defendants)

149.   Plaintiff repeats, realleges and reiterates each and every allegation set forth in paragraphs "1" through "148" with the same force and effect as if fully set forth herein at length.

150.   From 2002 through present, Plaintiff has worked diligently, tirelessly and remarkably successfully for Defendants.

151.   He was integrally responsible for driving assets under management at JPMF, primarily from Citigroup/Smith Barney, Merrill Lynch, Morgan Stanley and UBS, in separate accounts only, from virtually nothing to approximately Five Billion Five Hundred Million Dollars

-31-

($5,500,000,000.00) by first quarter 2005, not to mention the significant results of his effort with numerous other distributors and equally remarkable successes in mutual funds.

152.   Mr. Allen always worked with the reasonable expectation of being reasonably compensated for his work, efforts and earnings on behalf of Defendants.

153.   In fact, when he started, he was told he would receive a minimum of Seven Hundred and Fifty Thousand Dollars ($750,000.00) in total compensation for 2002.

154.   Instead, and despite materially shattering any performance goals for that year, Mr. Allen received compensation of One Hundred Thousand Dollars ($100,000.00) less than the agreed upon *minimum compensation* due him.

155.   In 2003 and 2004, as he continued to be integral to achieving unheard of success and growth in assets under management, he worked with the reasonable expectation of those same earnings, at a minimum.

156.   Despite promises to the contrary, unparalleled success and the substantial remuneration of other less effective group members, Mr. Allen was continually not paid either his expected total compensation or, assuredly, anywhere close to his net value to the Defendants, as he deserved.

157.   In cannot be truly questioned that Defendants profited enormously from the efforts and successes of Mr. Allen for which he not only expected to be, but for which Defendants promised that he would be additionally compensated.

158.   As Mr. Allen performed in good faith with the expectation of additional compensation and the behest of Defendants who accrued untold gains as a result of his efforts, he is clearly due additional but unpaid compensation.

-32-

159.   As a direct result of this breach of the doctrines of quantum meruit and unjust enrichment, Plaintiff was damaged in an amount determined at trial, but in no event less than Three Million Four Hundred Thousand Dollars ($3,400,000.00) in compensatory damages; costs and disbursements of this action; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## Jury Demand

160.   Plaintiff hereby demands a trial by jury.

Dated: New York, New York
       October 12, 2006

Law Offices of Neal Brickman
Neal Brickman (NB0874)
Ethan Leonard (EL2497)
Attorneys for Plaintiff
317 Madison Avenue - 21ˢᵗ Floor
New York, New York 10021
(212) 986-6840

-33-

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: Mr. Stephen Allen
267 Woodland Avenue
Westfield, NJ 07090

From: Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 160-2005-01523 | Rosemary Wilkes, Supervisor | 212-336-3771 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statute(s).

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Spencer H. Lewis, Jr., District Director

07/17/06
*(Date Mailed)*

Enclosure(s)

cc: **Respondent: JP Morgan Chase & Co.**

**Mr. Allen's attorney: Neal Brickman, Esq.**