UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

STEPHEN ALLEN,

                    Plaintiff,              06 Civ. 8712 (JGK)

        - against -                         MEMORANDUM OPINION
                                            AND ORDER
J.P. MORGAN CHASE & COMPANY, ET AL.,

                    Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

        The plaintiff, Stephen Allen, brings this action against

the defendants, J.P. Morgan Chase & Company; J.P. Morgan Chase

Bank, N.A. (collectively with J.P. Morgan Chase & Company,

"JPMorgan"); George Gatch; Eve Guernsey; and Lynn Avitabile

(collectively, the "defendants").  Deanna Basler ("Basler") was

originally named in the complaint, but the plaintiff agreed to

withdraw any claims against Basler and those claims are

therefore dismissed.  The plaintiff alleges that the defendants

discriminated against him on the basis of his age and disability

in violation of the Age Discrimination in Employment Act, 29

U.S.C. § 621, et seq. ("ADEA"); the Americans with Disabilities

Act, 42 U.S.C. § 12101, et seq. ("ADA"); New York Executive Law

§ 296 et seq. ("NYSHRL"); and New York City Administrative Code

§ 8-107, et seq. ("NYCHRL").  The plaintiff also asserts

retaliation claims under the ADEA, NYSHRL, and the NYCHRL, as

well as state common claims for fraudulent inducement, breach of

contract, quantum meruit, and unjust enrichment.  The defendants move for summary judgment dismissing the plaintiff's complaint in its entirety.

I.

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).

## II.

The following facts are taken from the evidence submitted to the Court and are construed in the light most favorable to the plaintiff.

The plaintiff, Stephen Allen, was born in May 1953 and is currently 55 years of age.  (Dep. of Stephen Allen ("Allen Dep."), attached as Ex. A to the Aff. of Stephanie Sowell ("Sowell Aff.") 10.)  The plaintiff joined JPMorgan on September 20, 2001 as Managing Director of the Funds Management business. (Defs.' 56.1 Statement ¶ 50; Pl.'s 56.1 Statement ¶ 50.) Previously, the plaintiff was a partner with Lord Abbett. (Defs.' 56.1 Statement ¶¶ 20, 25; Pl.'s 56.1 Statement ¶¶ 20, 25.)

In the summer of 2001, the plaintiff began to seek job opportunities outside Lord Abbett and called James Detmer ("Detmer"), a Managing Director at JPMorgan with whom he had previously worked at Lord Abbett, to inquire about opportunities at JPMorgan.  (Defs.' 56.1 Statement ¶¶ 18, 28; Pl.'s 56.1 Statement ¶¶ 18, 28.)  Detmer then contacted Robert Deutsch ("Deutsch"), Detmer's manager, to inform him that the plaintiff could be a potential candidate for the role of head of National Accounts in the Funds Management business.  (Defs.' 56.1 Statement ¶ 32; Pl.'s 56.1 Statement ¶ 32.)

During July and August 2001, the plaintiff met with several individuals at JPMorgan, including Deutsch; George Gatch ("Gatch"), CEO and President of Funds Management; and Ronald Dewhurst ("Dewhurst"), Managing Director and head of Asset Management Americas.  (Defs.' 56.1 Statement ¶¶ 12, 33; Pl.'s

4

56.1 Statement ¶¶ 12, 33.)  Detmer, Deutsch, Gatch, and Dewhurst are ages 54, 50, 45, and 55, respectively.  (Defs.' 56.1 Statement ¶¶ 15, 33; Pl.'s 56.1 Statement ¶¶ 15, 33.)  On August 27, 2001, Deutsch emailed Gatch proposing that JPMorgan make the plaintiff an offer.  Terms of the proposed offer were listed as "Title: Managing Director; Base Salary: $150,000; Target Total Comp: $750,000; 2001 pro-rated [incentive compensation]: $200,000."  (Defs.' 56.1 Statement ¶ 35; Pl.'s 56.1 Statement ¶ 35; Aff. of Ethan Leonard ("Leonard Aff.") Ex. F.)

The plaintiff received two other offers during this time period, one written offer from Ashland, and one verbal offer from Blackrock.  (Defs.' 56.1 Statement ¶¶ 37-38; Pl.'s 56.1 Statement ¶¶ 37-38.)  The plaintiff stated at his deposition that he thought the equity component of Ashland's was insufficient and that he turned down the offer from Ashland once he received the JPMorgan offer.  (Defs.' 56.1 Statement ¶ 37; Pl.'s 56.1 Statement ¶ 37; Allen Dep. 35-36, 77.)  The offer from Blackrock was put on hold after the World Trade Center attacks.  (Defs.' 56.1 Statement ¶ 38; Pl.'s 56.1 Statement ¶ 38; Allen Dep. 37-38.)  After joining JPMorgan, the plaintiff did not have any further conversations with Blackrock about job opportunities.  (Defs.' 56.1 Statement ¶ 39; Pl.'s 56.1 Statement ¶ 39.)  Other than the offers from Ashland and Blackrock, the plaintiff has not received any other offers of

employment since 2001.  (Defs.' 56.1 Statement ¶ 40; Pl.'s 56.1 Statement ¶ 40.)

In September 2001, Deutsch called the plaintiff to offer him a job.  (Defs.' 56.1 Statement ¶ 41; Pl.'s 56.1 Statement ¶ 41.)  The plaintiff claims that he specifically asked Deutsch for a minimum guarantee of $750,000 and told him that he was talking to several firms.  (Defs.' 56.1 Statement ¶ 42; Pl.'s 56.1 Statement ¶ 42.)  Deutsch told the plaintiff that bonuses were based on teamwork and the contribution of the firm and the unit.  (Defs.' 56.1 Statement ¶ 44; Pl.'s 56.1 Statement ¶ 44.)  The plaintiff alleges that he told Deutsch, "I want to make it to be very clear though in 2001 I'm taking a job and I'm getting a guarantee for my compensation in 2002 and it's going to be $750,000."  (Pl.'s 56.1 Statement ¶ 44; Allen Dep. 74.)  According to the plaintiff, Deutsch responded, "Yes, you will however receive a portion of your bonus in the following year as – or receive a portion of your compensation in the following year as a bonus."  (Pl.'s 56.1 Statement ¶ 44; Allen Dep. 74.)  Deutsch states in his affidavit that he did not make any promises or guarantees to the plaintiff regarding the total compensation he would make following performance year 2001.  (Deutsch Aff. ¶ 16.)

On or about September 18, 2001, Michelle Bucaria ("Bucaria"), Vice President of JPMorgan's Human Resources, sent

the plaintiff an offer letter.  (Defs.' 56.1 Statement ¶ 46;
Pl.'s 56.1 Statement ¶ 46; Leonard Aff. Ex. G.)  The offer
letter states that the plaintiff's base salary would be
$175,000.  (Leonard Aff. Ex. G.)  On the subject of incentive
compensation, the offer letter states, in pertinent part:

> As an officer of J.P. Morgan Chase & Co., you will be
> eligible to participate in the annual Incentive
> Compensation (IC) program, and for the year 2001 you will
> be eligible to receive an award of $200,000.  Awards are
> distributed in February.  Awards are discretionary and
> reflect J.P. Morgan Chase & Co.'s assessment of a number of
> considerations, including your teamwork and relative
> individual, business and Firm performance.  Awards will
> only be paid if you are an active employee at the time the
> awards are distributed.  This award is subject to any and
> all equity programs in place at the time the award is
> granted.  J.P. Morgan Chase & Co., reserves the right to
> change the terms of this program at any time.

(Leonard Aff. Ex. G.)  In a subsequent paragraph, the letter
states:  "Your employment with a J.P. Morgan Chase & Co., entity
and your compensation package and benefits eligibility are
subject to the full terms and conditions of the Firm's policies
and plans."  (Leonard Aff. Ex. G.)  The offer letter makes no
mention of the plaintiff's compensation structure for 2002.
(Leonard Aff. Ex. G.)  The plaintiff claims that Detmer and
Deutsch told him to sign the offer letter but that a new letter
guaranteeing minimum total compensation of $750,000 would be
sent by Federal Express.  (Defs.' 56.1 Statement ¶ 51; Pl.'s
56.1 Statement ¶ 51.)  On September 20, 2001, the plaintiff
signed the original offer letter.  (Defs.' 56.1 Statement ¶ 52;

Pl.'s 56.1 Statement ¶ 52.)   The plaintiff never received a

revised offer letter from JPMorgan.   (Defs.' 56.1 Statement ¶

53; Pl.'s 56.1 Statement ¶ 53.)

On September 21, 2001, at Deutsch's request, Bucaria sent

the plaintiff an email to clarify the terms of his bonus

compensation.   The email states, in pertinent part:

> As I mentioned to you our bonuses are determined on a
> calendar cycle and paid out the following Feb.  The bonus
> number in the letter represents a prorated portion of the
> annualized figure that Bob quoted you.  As we mention in
> the letter that will be paid in Feb of 2002.  For the
> calendar year 2002 we would anticipate your total
> compensation to be $750k depending upon firm, business and
> individual performance.

(Sowell Ex. J (Defs.' Ex. 3).)   It is undisputed that the

plaintiff never received any written documents promising a

minimum amount of incentive compensation for a given performance

year.   (Defs.' 56.1 Statement ¶ 60; Pl.'s 56.1 Statement ¶ 60.)

On October 1, 2001, the plaintiff began his employment with

JPMorgan as the functional co-head of the broker-dealer area

alongside Detmer.   (Defs.' 56.1 Statement ¶¶ 58, 61; Pl.'s 56.1

Statement ¶¶ 58, 61.)   From 2001 to 2005, his compensation was

as follows.   In early 2002, the plaintiff received incentive

compensation of $200,000 for the 2001 performance year.   In

performance year 2002, JPMorgan did not have a good year, and

bonuses were down across the entire firm.   (Defs.' 56.1

Statement ¶ 401; Pl.'s 56.1 Statement ¶ 401; Deutsch Aff. ¶ 17.)

In January 2003, the plaintiff received total compensation for performance year 2002 of $650,000, of which $475,000 was incentive compensation.  (Defs.' 56.1 Statement ¶ 403; Pl.'s 56.1 Statement ¶ 403.)  This determination was made by Deutsch, Gatch, and Dewhurst.  (Defs.' 56.1 Statement ¶ 402; Pl.'s 56.1 Statement ¶ 402.)  After receiving his 2002 bonus, the plaintiff complained to Deutsch and Gatch about not having received $750,000 in total compensation.  (Defs.' 56.1 Statement ¶ 404; Pl.'s 56.1 Statement ¶ 404.)  Deutsch informed the plaintiff that he had always told the plaintiff that incentive compensation was predicated on the performance of the firm, that the pool was very "tight," and that he had always been told that he could get less if business conditions warranted it.  (Defs.' 56.1 Statement ¶ 405; Pl.'s 56.1 Statement ¶ 405.)  For performance years 2003, 2004, and 2005, the plaintiff received total compensation of $650,000, $550,000, and $450,000, respectively, of which incentive compensation was $475,000, $375,000, and $275,000, respectively.  (Defs.' 56.1 Statement ¶¶ 411-12; Pl.'s 56.1 Statement ¶¶ 411-12.)  Incentive compensation for JPMorgan employees is determined according to a number of inputs: (1) market data – comparison of a person's role relative to the market; (2) performance of the business unit; (3) performance of JPMorgan in total; (4) the performance evaluation

of the individual; and (5) the talent review rating.  (Defs.'
56.1 Statement ¶ 66; Pl.'s 56.1 Statement ¶ 66.)

The plaintiff's performance reviews indicate that he
delivered exceptional results in the broker-dealer area, but
that he also had significant problems interacting with other
JPMorgan employees.  For example, in his 360 performance
reviews, he received frequent negative comments that: (1) he did
not listen to or communicate well with others, (Defs.' 56.1
Statement ¶¶ 93-94, 97, 99, 109, 110, 112, 118, 120, 122-24,
219, 221, 384-85, 388; Pl.'s 56.1 Statement ¶¶ 93-94, 97, 99,
109, 110, 112, 118, 120, 122-24, 219, 221, 384-85, 388); that he
did not accept or engage the opinions and perspectives of
others, (Defs.' 56.1 Statement ¶¶ 95, 99-101, 104, 106-09, 118,
121, 219, 225, 228-29; Pl.'s 56.1 Statement ¶¶ 95, 99-101, 104,
106-09, 118, 121, 219, 225, 228-29); that he needed to improve
his internal relationships within the company (Defs.' 56.1
Statement ¶¶ 95-96, 109, 110, 228-29, 384, 388; Pl.'s 56.1
Statement ¶¶ 95-96, 109, 110, 228-29, 384, 388); and that he had
an "edge" and sometimes alienated or demotivated other employees
(Defs.' 56.1 Statement ¶¶ 102-03, 120-23; Pl.'s 56.1 Statement
¶¶ 102-03, 120-23).  However, his reviewers also praised the
plaintiff for various positive traits, including his intellect
and industry knowledge, (Pl.'s 56.1 Statement ¶¶ 93-94, 102,
121, 124, 384-87), his ability to deliver results, (Pl.'s 56.1

Statement ¶¶ 93, 99, 122, 124, 219, 225, 228, 387), his effectiveness with clients, (Pl.'s 56.1 Statement ¶¶ 93-95, 104, 122, 124, 385), his breadth of relationships, (Pl.'s 56.1 Statement ¶¶ 102, 104, 124, 222, 385), and his energy level, (Pl.'s 56.1 Statement ¶¶ 93, 96, 104, 119-120, 225).

In 2002 and 2003, the plaintiff received below average ratings from his co-workers in the area of Leadership Values, with the lowest ratings coming from his two managers, Deutsch and Gatch. (Defs.' 56.1 Statement ¶¶ 91-92, 126-29; Pl.'s 56.1 Statement ¶¶ 91-92, 126-29.) The defendants have also submitted numerous affidavits and depositions of other co-workers of the plaintiff who express similar negative views of the plaintiff's interpersonal style. (See, e.g., Aff. of Nicole St. Pierre ("St. Pierre Aff.") ¶¶ 9-14, 20-21; Aff. of David Thorp ¶¶ 8-10, 14). Nicole St. Pierre ("St. Pierre") states that working with the plaintiff during 2002 and 2003 was so difficult that she even considered leaving the firm. (Defs.' 56.1 Statement ¶ 143; Pl.'s 56.1 Statement ¶ 143; St. Pierre Aff. ¶ 16.) St. Pierre also alleges that the plaintiff tended to overcommit to clients without consulting internal colleagues. (Defs.' 56.1 Statement ¶ 139; Pl.'s 56.1 Statement ¶ 139; St. Pierre Aff. ¶ 13.) As one example, St. Pierre describes a deal involving a company named Parametric where JPMorgan had to pull out of an agreement that the plaintiff had made with Parametric because the

plaintiff did not first consult anyone inside JPMorgan.  (Defs.'
56.1 Statement ¶ 141; St. Pierre Aff. ¶¶ 13-14.)   The plaintiff
denies this allegation.  (Pl.'s 56.1 Statement ¶ 141.)

In late 2003, Deutsch and Gatch decided to speak to the
plaintiff about his performance that year and to have Detmer be
the sole head of the broker-dealer area, with the plaintiff
reporting to Detmer.  (Defs.' 56.1 Statement ¶¶ 187-88; Pl.'s
56.1 Statement ¶¶ 187-88.)   Detmer met with the plaintiff to
discuss the plaintiff's performance issues.  (Defs.' 56.1
Statement ¶ 189; Pl.'s 56.1 Statement ¶ 189.)   Gatch also met
with the plaintiff to tell him that he would be reporting to
Detmer.  (Defs.' 56.1 Statement ¶ 194; Pl.'s 56.1 Statement ¶
194.)   Under this arrangement, the plaintiff was instructed to
focus on the company's external relationships, and Detmer was to
handle internal issues.  (Defs.' 56.1 Statement ¶ 195; Pl.'s
56.1 Statement ¶ 195.)

In September 2004, Detmer gave the plaintiff an improved
performance review and told him that his interactions with
colleagues had improved.  (Defs.' 56.1 Statement ¶ 215; Pl.'s
56.1 Statement ¶ 215.)   He also told the plaintiff, however,
that his improvement needed to continue and be consistent, and
that it was unlikely that his responsibility and/or income would
grow.  (Defs.' 56.1 Statement ¶ 215; Pl.'s 56.1 Statement ¶
215.)   On November 3, 2004, Gatch, Deutsch, Detmer, and others

12

held a talent committee review of the plaintiff in which they
also concluded that the plaintiff had improved, but that he
still did not work well with others.  (Defs.' 56.1 Statement ¶¶
230-32, 245; Pl.'s 56.1 Statement ¶¶ 230-32, 245.)  Of the
twenty-seven employees reviewed at the talent committee review,
the plaintiff was one of only two people to receive the rating
of "3 – Needs Improvement."  (Defs.' 56.1 Statement ¶¶ 234, 240;
Pl.'s 56.1 Statement ¶¶ 234, 240.)  The committee decided that
the plaintiff should exit the company by the second quarter of
2005 if he did not vastly improve.  (Defs.' 56.1 Statement ¶
235; Pl.'s 56.1 Statement ¶ 235.)

     In November and December 2004, Gatch, Detmer, and members
of HR spoke about what to do about the plaintiff.  (Defs.' 56.1
Statement ¶¶ 241-50; Pl.'s 56.1 Statement ¶¶ 241-50.)  According
to Noreen Mormando ("Mormando"), a member of HR, Detmer was
concerned about having someone in the role of head of National
Accounts who was not doing the full role.  (Defs.' 56.1
Statement ¶ 242; Pl.'s 56.1 Statement ¶ 242.)  Gatch, Detmer,
Mormando, and others discussed either having the plaintiff take
on the full range of duties of the head of National Accounts
role, including interacting with internal colleagues, or having
the plaintiff exit the firm.  (Defs.' 56.1 Statement ¶ 244;
Pl.'s 56.1 Statement ¶ 244.)  In November 2004, Gatch, Detmer,
and others began speaking to Deanna Basler ("Basler") as a

potential candidate for the head of National Accounts role.
(Defs.' 56.1 Statement ¶¶ 415-16; Pl.'s 56.1 Statement ¶¶ 415-16.)  Basler was born in January 1963 and is almost ten years
younger than the plaintiff.  (Aff. of Noreen Mormando ("Mormando
Aff.") Ex. 1.)  In December 2004, members of HR began looking
into what kind of exit package could be offered to the
plaintiff.  (Defs.' 56.1 Statement ¶¶ 245-50; Pl.'s 56.1
Statement ¶¶ 245-50.)  On December 23, 2004, approval was
obtained to proceed with the plaintiff's "negotiated departure."
(Defs.' 56.1 Statement ¶ 249; Pl.'s 56.1 Statement ¶ 249.)

On January 4, 2005, Detmer met with the plaintiff and told
him that he had either to assume fully the responsibilities of
head of National Accounts or to take a termination package.
(Defs.' 56.1 Statement ¶ 251; Pl.'s 56.1 Statement ¶ 251.)
Detmer also informed him that he would be on a "zero tolerance"
policy regarding his interactions with internal colleagues,
meaning that "any poor behavior would be grounds for dismissal."
(Defs.' 56.1 Statement ¶¶ 252-53; Pl.'s 56.1 Statement ¶¶ 252-53.)  The same day, the plaintiff had a series of meetings with
Detmer, Gatch, and Mormando in which the plaintiff objected to
the assessment that he was not performing the full role of his
position.  (Defs.' 56.1 Statement ¶¶ 254-61; Pl.'s 56.1
Statement ¶¶ 254-61.)  In one of those meetings, Detmer
expressed the opinion that the plaintiff was doing most of the

job, perhaps around 90% of his full role.  (Defs.' 56.1
Statement ¶¶ 260, 262; Pl.'s 56.1 Statement ¶¶ 260, 262.)
Detmer stated at his deposition, however, that he believed that
the plaintiff had only been doing about 75% of his role.
(Defs.' 56.1 Statement ¶ 262; Pl.'s 56.1 Statement ¶ 262.)
Later that evening, at the plaintiff's request, Detmer provided
the plaintiff with a written document regarding his performance
in 2004.  (Defs.' 56.1 Statement ¶ 265; Pl.'s 56.1 Statement ¶
265.)  The written review states that the plaintiff's
interpersonal issues had improved since December 2003 and
repeats the same comments as those expressed at the plaintiff's
September 2004 review.  (Sowell Ex. J (Defs.' Ex. 13).)

     The plaintiff met again with Gatch and Mormando on January
10, 2005, during which the plaintiff and Gatch disputed the
plaintiff's performance issues.  (Defs.' 56.1 Statement ¶¶ 267-
73; Pl.'s 56.1 Statement ¶¶ 267-73.)  At the meeting, the
plaintiff stated that he was going to file an action against
JPMorgan for age discrimination, breach of contract, and fraud.
(Defs.' 56.1 Statement ¶ 274; Pl.'s 56.1 Statement ¶ 274.)

     On January 28, 2005, the plaintiff emailed Eve Guernsey
("Guernsey"), head of Investment Management Americas for
JPMorgan, to complain about what he perceived as cronyism.
(Defs.' 56.1 Statement ¶ 277; Pl.'s 56.1 Statement ¶ 277.)
Guernsey and the plaintiff were scheduled to meet on February 8,

but that meeting was postponed when the plaintiff was admitted
to the hospital for divertuculitis on February 7.  (Defs.' 56.1
Statement ¶ 284; ; Pl.'s 56.1 Statement ¶ 284.)  On February 15,
the plaintiff finally had a meeting with Guernsey, in which he
alleged, among other complaints, that Gatch tended to favor
younger employees over older ones.  (Defs.' 56.1 Statement ¶¶
287-89; Pl.'s 56.1 Statement ¶¶ 287-89.)  The plaintiff also
told Guernsey that he wanted to stay at JPMorgan, and Guernsey
told the plaintiff that she would look into other opportunities
at the firm.  (Defs.' 56.1 Statement ¶¶ 290-91; Pl.'s 56.1
Statement ¶¶ 290-91.)  During February, Guernsey, Bucaria,
Detmer, and Gatch decided that the organization would be best
served by placing the plaintiff in an individual contributor
role as opposed to a managerial role.  (Defs.' 56.1 Statement ¶
296-97.)  The plaintiff disputes that allegation and claims
instead that Gatch wanted to replace Allen with a younger
employee, namely, Basler.  (Pl.'s 56.1 Statement ¶ 297.)

      In January 2005, the plaintiff had also complained about
not having received a review for 2004.  (Defs.' 56.1 Statement ¶
293; Pl.'s 56.1 Statement ¶ 293.)  In February, Bucaria, Gatch,
Detmer, and Lynn Avitabile ("Avitabile"), the head of Human
Resources for JPMorgan Investment Management Americas, prepared
a formal written review by adding to the written 2004 review
that had been prepared by Detmer.  (Defs.' 56.1 Statement ¶ 306;

Pl.'s 56.1 Statement ¶ 306.)  On March 3, Gatch and Detmer met
with the plaintiff to present him with the formal written
review.  (Defs.' 56.1 Statement ¶ 308; Pl.'s 56.1 Statement ¶
308.)  At the meeting, they also informed him of the decision to
place the plaintiff in the role of Senior Client Relationship
Manager.  (Defs.' 56.1 Statement ¶ 308; Pl.'s 56.1 Statement ¶
308.)  The meeting was memorialized in a memo written by Gatch
and Detmer, which states that they wanted the plaintiff to take
the Senior Client Relationship Manager position, and that he
would make the same annualized salary, work in the same office
location, and retain the same title of Managing Director.
(Defs.' 56.1 Statement ¶ 312; Pl.'s 56.1 Statement ¶ 312; Sowell
Ex. K (Pl.'s Ex. X).)  On March 8, the plaintiff emailed Detmer
indicating that he was accepting the new position "UNDER
PROTEST."  (Defs.' 56.1 Statement ¶ 318; Pl.'s 56.1 Statement ¶
318; Sowell Ex. K (Pl.'s Ex. Z).)  The plaintiff's attorney then
sent a letter to Guernsey, dated March 15, detailing the claims
that the plaintiff planned to bring against JPMorgan.  (Defs.'
56.1 Statement ¶ 319; Pl.'s 56.1 Statement ¶ 319; Sowell Ex. K
(Pl.'s Ex. II).)  On March 16, 2005, the plaintiff filed a
Charge of Discrimination with the EEOC.  (Sowell Ex. H.)

    From March 28 to May 2, 2005, the plaintiff was on leave
for a surgical procedure related to his divertuculitis.  (Defs.'
56.1 Statement ¶ 300; Pl.'s 56.1 Statement ¶ 300.)  During his

absence, Basler, at age 42, was selected for the role of head of Business Development, which included the duties of the head of National Accounts. (Defs.' 56.1 Statement ¶ 320; Pl.'s 56.1 Statement ¶ 320; Mormando Aff. Ex. 1.) On June 14, after the plaintiff had returned from medical leave, he sent an email to Detmer complaining that he was still awaiting assignment of his responsibilities. (Defs.' 56.1 Statement ¶ 321; Pl.'s 56.1 Statement ¶ 321.) He also requested that he receive a mid-year performance review before an EEOC mediation that was to be held on May 2, 2005. (Defs.' 56.1 Statement ¶ 322; Pl.'s 56.1 Statement ¶ 322.)

On June 15, 2005, Basler gave the plaintiff his account assignments. (Defs.' 56.1 Statement ¶ 324; Pl.'s 56.1 Statement ¶ 324.) On July 6, Basler's assistant sent out an email listing broker-dealer account assignments. (Defs.' 56.1 Statement ¶ 329; Pl.'s 56.1 Statement ¶ 329.) The list of assignments shows that the plaintiff was assigned to the UBS and Morgan Stanley accounts, and that his name was listed second, after Kevin Shanley for UBS and after Anne Santoro for Morgan Stanley. (Defs.' 56.1 Statement ¶ 331; Pl.'s 56.1 Statement ¶ 331.) Avitabile states that it was her understanding that Basler wanted to create a structure where one person would be the lead person on an account, and the other person would be the secondary, and that Basler had placed less experienced people as

18

leads on accounts where the plaintiff was the secondary so that they could broaden their relationships with the clients. (Defs.' 56.1 Statement ¶¶ 358-59.)

In August 2005, Basler resigned from JPMorgan. (Defs.' 56.1 Statement ¶ 417; Pl.'s 56.1 Statement ¶ 417.) Following Basler's resignation, David Thorp ("Thorp"), at age 47, assumed the head of National Accounts role. Thorp held that position until May 2006. In May 2006, at age 33, Jed Laskowitz was selected to become head of National Accounts. (Defs.' 56.1 Statement ¶ 424; Pl.'s 56.1 Statement ¶ 424; Mormando Aff. ¶ 24.) In 2006, Detmer was given the choice either to take an exit package or to accept a demotion, and Detmer chose to leave the firm. (Defs.' 56.1 Statement ¶¶ 393-94; Pl.'s 56.1 Statement ¶¶ 393-94; Leonard Aff. Ex. A, Dep. of James Detmer ("Detmer Dep.") 246-47.) Detmer was then replaced by Thorp. (Detmer Dep. 247; Mormando Aff. ¶ 24.)

On July 17, 2006, the EEOC issued the plaintiff a right to sue letter and informed him that its investigation failed to indicate that a violation of the ADEA or ADA had occurred. (Defs.' 56.1 Statement ¶ 461, Sowell Ex. I.) On October 12, 2006, the plaintiff filed this action. (Defs.' 56.1 Statement ¶ 463; Pl.'s 56.1 Statement ¶ 463.)

III.

The defendants move for summary judgment on all of the plaintiff's claims, namely, his claims of age discrimination under the ADEA, NYSHRL, and NYCHRL; his claims of disability discrimination under the ADA, NYSHRL, and NYCHRL; and his state law claims of fraudulent inducement, breach of contract, and quantum meruit and/or unjust enrichment.

A.

Employment discrimination claims brought pursuant to the ADEA, the NYSHRL, and the NYCHRL are governed at the summary judgment stage by the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (ADEA); Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (NYSHRL and NYCHRL). To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that: (1) he was within the protected age group; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Terry, 336 F.3d at 137-38. If the plaintiff meets his minimal burden of establishing a prima facie case, the burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. St. Mary's Honor Ctr.

20

V. Hicks, 509 U.S. 502, 506-07 (1993).  If the defendant
articulates a legitimate reason for the action, the presumption
of discrimination raised by the prima facie case drops out, and
the plaintiff has the opportunity to demonstrate that the
proffered reason was not the true reason for the employment
decision and that the plaintiff's membership in a protected
class was.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.
248, 254-56 (1981).  "The ultimate burden of persuading the
trier of fact that the defendant intentionally discriminated
against the plaintiff remains at all times with the plaintiff."
Id. at 253.

1.

The defendants argue that the plaintiff has failed to
establish a prima facie case of age discrimination only because
he has not shown circumstances giving rise to an inference of
discrimination.  However, to show circumstances giving rise to
an inference of discrimination for the purpose of establishing a
prima facie case of discrimination, it is sufficient that the
plaintiff was replaced by a woman substantially younger than the
plaintiff.  See Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181,
187 (2d Cir. 2006); Schnabel v. Abramson, 232 F.3d 83, 87 (2d
Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135
(2d Cir. 2000).

2.

The defendants argue that even if the plaintiff has made
out a prima facie case, the plaintiff's claim should still be
dismissed because he has failed to show that the defendants'
articulated reasons for taking adverse actions against him were
pretextual.  The defendants state that they removed the
plaintiff from his role because he exhibited poor teamwork and
communication skills.  Because the defendants have articulated
legitimate and nondiscriminatory reasons for taking adverse
actions against the plaintiff, the plaintiff must therefore
prove that this reason was false and that the real reason for
the adverse actions was discrimination.  See St. Mary's Honor
Ctr., 509 U.S. at 515-16.

However, the plaintiff has set forth sufficient evidence to
create genuine issues of material fact as to whether this reason
was pretextual and whether the plaintiff was removed from his
role because of his age.  First, there are factual disputes over
the plaintiff's actual performance, including over how much of
the role of head of National Accounts the plaintiff had been
performing.  Second, the plaintiff also claims that the concrete
examples provided by the defendants of the plaintiff's poor
interpersonal skills were untrue.  Under Reeves v. Sanderson
Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000), evidence of
an employer's dishonesty about a material fact, combined with a

22

prima facie case of discrimination, may permit the trier of fact to infer a discriminatory purpose.  Among other assertions, he states that he did not scuttle the Parametric deal and that he did not make unrealistic promises to customers.  Third, after Basler left JPMorgan, the plaintiff's role was later filled by by Laskowitz, who was also significantly younger than the plaintiff.  According to the plaintiff, Laskowitz suffered from many of the same complaints that were made against the plaintiff, namely, that he also lacked teamwork skills and did not manage well.  Nonetheless, Laskowitz was promoted rather than demoted.  Furthermore, the plaintiff identifies other individuals over the age of forty who were allegedly also terminated as further evidence of age-based animus.  Although the defendants rebut this allegation with statistical evidence showing the number of employees above and below the age of 40 who were terminated by the company, this data creates a fact issue which should accordingly be decided by a jury.

The defendants raise two defenses which they claim preclude a reasonable factfinder from concluding that the plaintiff was demoted because of his age.  First, they invoke the "same actor" defense, pointing out that Gatch and Detmer were involved in both his hire and his alleged demotions.  Second, they note that five of the six talent committee members who rated plaintiff a "3 – Needs Improvement" and the decision makers responsible for

the plaintiff's March 2005 removal from his role, namely, Gatch and Detmer, were all over the age of forty.

Both of these contentions are unavailing.  The Court of Appeals for the Second Circuit has held that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).  However, this "same actor inference" is "less compelling when a significant period of time elapses between the hiring and firing".  Carlton, 202 F.3d at 137-38 (time period of seven years between hiring and firing).  While this "same actor" inference has been applied in cases where as much as three years separated the plaintiff's hiring and the alleged subsequent adverse employment action, those cases are not controlling here.

In Schnabel, 232 F.3d at 91, the Court of Appeals drew a same actor inference where three years had elapsed between the plaintiff's hiring and firing.  However, the court affirmed summary judgment for the employer based upon its conclusion that the plaintiff had presented no evidence that would have supported an inference of age discrimination, and the same actor inference, although "highly relevant," was only one of several factors cited by the court.  Id.  Here, where there is at least some additional evidence supporting an inference of age

discrimination, and more than a three year time gap separating the plaintiff's hiring and demotion, the Court could not conclude that no reasonable trier of fact could find that the plaintiff was demoted because of his age.  See Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) (rejecting same actor inference in race discrimination case where more than three years had elapsed between plaintiff's hiring and firing); Harris v. City of New York, No. 03 Civ. 6167, 2004 WL 2943101, at *4 (S.D.N.Y. Dec. 21, 2004) (rejecting same actor inference in race discrimination case where failure to promote occurred over three years after the plaintiff's hiring); Ramos v. Marriott Int'l, Inc., 134 F. Supp. 2d 328, 345-46 (S.D.N.Y. 2001) (declining to apply same actor inference in gender discrimination case where plaintiff was terminated one year after her hiring).

Second, the argument that the decision makers behind the plaintiff's review and alleged demotion could not have discriminated against the plaintiff because they were also over the age of forty is, as the Court of Appeals has described such arguments, "patently untenable."  See Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998) (rejecting proposition that people in a protected category cannot discriminate against fellow class members).  Although Detmer is the same age as the plaintiff, he was forced out of JPMorgan in 2006, and Gatch is

over nine years younger than the plaintiff.  (See Mormando Aff. ¶ 24.)  These facts do not preclude an inference of age discrimination.

Considering the evidence as a whole, the Court could not conclude at this stage that a rational factfinder could not find that the defendants' proffered reason was pretextual and that the plaintiff was removed from his role because of his age. Therefore, the defendants' motion for summary judgment with respect to the plaintiff's age discrimination claims is denied.

**B.**

In the opposition to the motion to dismiss, the plaintiff concedes that his claim based upon his alleged demotion upon returning from medical leave should have been brought under the Family Medical Leave Act (the "FMLA") or as a breach of contract claim, rather than under the ADA and its state and city counterparts.  The plaintiff has made no effort to defend his claims of disability discrimination under the ADA and its state and city counterparts.  The plaintiff now requests that the Court exercise its discretion "to conform the pleading to proof."  However, these claims were not pleaded in the plaintiff's complaint, and it would be unfairly prejudicial to the defendants to allow the plaintiff to assert such claims for the first time in its opposition to the motion for summary judgment as a means of avoiding summary judgment.  See Beckman

v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)
(collecting cases).  Therefore, the defendants' motion for
summary judgment with respect to the plaintiff's disability
discrimination claims under the ADA, NYSHRL, and NYCHRL is
granted.

### C.

To establish a prima facie case of retaliation under Title
VII, a plaintiff must show that: (1) he engaged in a protected
activity; (2) his employer was aware of this activity; (3) the
employer took an employment action disadvantaging the plaintiff;
and (4) a causal connection exists between the alleged adverse
action and the protected activity.  See Richardson v. Comm'n on
Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008);
Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d
Cir. 2006).  Retaliation claims under the NYSHRL and NYCHRL are
evaluated using the same analysis.  See Cruz v. Coach Stores,
Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

### 1.

According to the defendants, the plaintiff's retaliation
claims must fail because he cannot prove a causal connection
between his complaints and any alleged retaliatory actions.  The
defendants argue that under Slattery v. Swiss Reinsurance
America Corp., 248 F.3d 87, 95 (2d Cir. 2001), the fact that the
defendants had taken steps toward removing the plaintiff from

his role before he made his first complaints of discrimination
precludes a finding that his complaints caused the defendants to
take the adverse action against him.

Slattery observed that while "temporal proximity can
demonstrate a causal nexus . . . , [w]here timing is the only
basis for a claim of retaliation, and gradual adverse job
actions began well before the plaintiff had ever engaged in any
protected activity, an inference of retaliation does not arise."
Id.  In Slattery, however, progressive discipline of the
plaintiff began five months before the plaintiff filed his EEOC
complaint, and he continued to perform below expectations even
after the filing of the complaint.  Id.  Here, the defendants
did not take their first adverse action against the plaintiff
until January 4, 2005, only six days before the plaintiff's
first complaints, although the evidence indicates that they
began considering taking action as early as November or December
2004.  In any case, it cannot be said that extensive or
significant discipline had already taken place before the
plaintiff first engaged in any protected activities.  Cf. id.;
Luxemberg v. Guardian Life Ins. Co., No. 02 Civ. 9116, 2004 WL
385116, at *5 (S.D.N.Y. Mar. 2, 2004) (five months between start
of adverse actions and protected activity); but cf. Ricks v.
Conde Nast Publ'ns, Inc., 92 F. Supp. 2d 338, 342 (S.D.N.Y.
2000) (finding no causal connection where employer started

28

taking steps toward termination two weeks before plaintiff's first complaint about discrimination, but where plaintiff had been employed for less than two months).

Moreover, there is no evidence that the plaintiff breached the "zero tolerance" policy or otherwise engaged in any offending behavior after voicing his complaints on January 10. There was thus no showing of the basis for the defendants to take the further adverse action against the plaintiff when he was complying with the conditions the defendants had already set. Furthermore, Detmer expressed the opinion that moving the plaintiff to an individual contributor role was "bad business" because the firm had already offered him the option of staying in his prior position under the zero tolerance policy. (Defs.' 56.1 Statement ¶ 299; Pl.'s 56.1 Statement ¶ 299.)

Given that comment, the lack of evidence showing that the plaintiff did not meet expectations after January 4, and the short time frame between the plaintiff's complaint on January 10 and the subsequent decision to remove him from the head of National Accounts role on March 3, there are plainly issues of fact as to whether his complaint caused the defendants to remove him from his role. Therefore, the defendants' motion for summary judgment with respect to the plaintiff's retaliation claim based upon the March 3 decision to remove him from his role is denied.

2.

With respect to the July 6 account assignments listing the plaintiff as the secondary person on the accounts, the defendants argue that this action was not adverse because it did not affect the plaintiff's title or compensation, and that the plaintiff cannot prove causation because there is no evidence that Basler knew about the plaintiff's discrimination claim. However, it is well established that work assignments may be retaliatory even if they do not affect an employee's title or compensation. See Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 70-71 (2006). The plaintiff alleges that the assignments reduced his responsibilities, that the secondary role was a junior role often filled by employees straight out of business school, and that the assignments were memorialized and sent to external clients, leading colleagues in the industry to ask him questions about it. These statements create at least an issue of fact as to whether the July 6 account assignments would have been materially adverse to a reasonable employee.

The defendants also assert that the plaintiff cannot establish a prima facie case of retaliation based on the July 6 account assignments because there is no evidence that Basler was aware of his claims at the time she made the assignments. The plaintiff's only response to this argument is his claim that "he believed that Detmer told him that Detmer had told Basler avoid

Allen's pre-existing complaints." (Pl.'s 56.1 Statement ¶ 326.) However, there is no evidence to support this response, and the plaintiff's testimony at his deposition was far more equivocal and did not even assert that his conversation with Detmer, or Detmer's alleged conversation with Basler, occurred prior to the assignments. (Allen Dep. 365.) Indeed, the plaintiff testified unequivocally that he did not know whether Basler knew about his charge prior to her making the account assignments. (Allen Dep. 365.)

However, it is undisputed that JPMorgan knew of the plaintiff's internal and external complaints. While "[t]he lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection," Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (emphasis in original), the Court of Appeals for the Second Circuit has never "held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." Id. at 116. Therefore, the fact that JPMorgan was aware of the plaintiff's complaints satisfies the second prong of the prima facie retaliation claim.

Finally, the temporal proximity of the plaintiff's complaints and the July 6 account assignments supports the causation prong of the prima facie retaliation claim. Even in

31

the absence of proof that the relevant decision-maker was aware
of the plaintiff's protected activities, "proof of a causal
connection can be show merely by the proximity in time between
the protected activity and the adverse employment action."
Alston v. New York City Transit Auth., 14 F. Supp. 2d 308, 312-
13 (S.D.N.Y. 1998) (citing Manoharan v. Columbia Univ. College
of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)).
Here, Basler gave the plaintiff the allegedly inferior
assignments six months after his first internal complaint and
four months after he filed his EEOC charge.  The Court could not
say that no reasonable juror could infer from this proximity
that Basler made the assignments with a retaliatory intent.  See
Espinal v. Goord, 554 F.3d 216, 228 (2d Cir. 2009) (noting that
the Court of Appeals has not drawn a "bright line" defining how
long is too long to establish a causal connection and finding
that passage of only six months was sufficient to support an
inference of causation).  Accordingly, the plaintiff has
established a prima facie claim that Basler's July 6 account
assignments were retaliatory, and the defendants' motion for
summary judgment dismissing that claim is denied.

### D.

"Under New York law, the five elements of a fraud claim
must be shown by clear and convincing evidence: (1) a material
misrepresentation or omission of fact (2) made by the defendant

with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnestock & Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006). A fraudulent inducement claim "can be supported by a false statement of present fact, or by a false statement of future intent which concerns a matter collateral to a contract between the parties." Four Finger Art Factory, Inc. v. Dinicola, No. 99 Civ. 1259, 2001 WL 21248, at *3 (S.D.N.Y. Jan. 9, 2001) (internal quotations and citation omitted).

Here, the plaintiff has not fulfilled four out of the five elements required to prove his fraudulent inducement claim. First, the only documented statements made to the plaintiff indicated that he could potentially earn up to $750,000, and these were plainly not false. Even if Deutsch did promise the plaintiff that he would receive $750,000, an allegation which Deutsch denies, the plaintiff has not adduced any evidence that Deutsch made such a statement with an intent to defraud.

Moreover, the plaintiff's reliance on Deutsch's alleged oral promises to him would not have been reasonable in light of the express terms of the offer letter, which the plaintiff signed, as well as the subsequent email sent to the plaintiff on September 21. Under New York law, "[w]here . . . there is a 'meaningful' conflict between an express provision in a written

contract and a prior alleged oral representation, the conflict negates a claim of a reasonable reliance upon the oral representation." Stone v. Schulz, 647 N.Y.S.2d 822, 823 (App. Div. 1996) (collecting cases). Because the plaintiff has not shown a false statement of future intent, made by the defendants with knowledge of its falsity, an intent to defraud, or reasonable reliance, summary judgment for defendants on the plaintiff's fraudulent inducement claim is granted.

### E.

Next, the defendants seek to dismiss the plaintiff's breach of contract claim. Under New York law, "where . . . a written agreement between sophisticated, counseled businessmen is unambiguous on its face, plaintiff cannot defeat summary judgment by a conclusory assertion that . . . the writing did not express his own understanding of the oral agreement reached during negotiations." Namad v. Salomon Inc., 543 N.E.2d 722, 724 (N.Y. 1989) (internal quotation marks and citation omitted); see also Kaplan v. Capital Co. of Am. LLC, 747 N.Y.S.2d 504, 505-06 (App. Div. 2002) (holding that plaintiff did not have breach of contract claim based upon alleged oral promise of an amount of bonus compensation when company's handbook stated that bonus compensation was purely discretionary). Here, the plaintiff's offer letter clearly states that bonus awards are

discretionary.  Accordingly, summary judgment for the defendants
on the plaintiff's breach of contract claim is granted.

**F.**

In the alternative to the breach of contract claim, the
plaintiff also brings quantum meruit and unjust enrichment
claims.  The defendants seek to dismiss these claims on the
ground that these claims are barred by the express terms of the
plaintiff's offer letter and the September 21 email.

Under New York law, quantum meruit and unjust enrichment
claims may be considered together as a "single quasi contract
claim."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v.
Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005).  To recover
in quantum meruit, the plaintiff must show: "(1) the performance
of services in good faith, (2) the acceptance of the services by
the person to whom they are rendered, (3) an expectation of
compensation therefor, and (4) the reasonable value of the
services."  Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d
Cir. 2000).  It is a well-settled principle of New York law that
quasi-contract claims such as quantum meruit and unjust
enrichment ordinarily are not available where there is a valid
agreement between the parties covering the same subject matter.
See Mid-Hudson, 418 F.3d at 175; Payday Advance Plus, Inc. v.
Findwhat.com, Inc., 478 F. Supp. 2d 496, 504 (S.D.N.Y. 2007).
Because the offer letter and September 21 email covered the

subject of the plaintiff's incentive compensation, summary
judgment dismissing the plaintiff's quantum meruit and unjust
enrichment claims is granted.

## CONCLUSION

The Court has carefully considered all of the parties'
arguments. To the extent not specifically addressed in this
Opinion, they are either moot or without merit. For the reasons
explained above, the defendants' motion for summary judgment is
**granted in part** and **denied in part**. The Clerk is directed to
close Docket No. 19.

SO ORDERED.

Dated:    New York, New York
          March 30, 2009

John G. Koeltl
United States District Judge

36